## SIT SING KUM et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. November 16, 1921.)

### No. 45.

1. **Aliens ⬦=32(8)—Evidence held not to support claim of Chinese that they were born in the United States.**

Where the testimony of two Chinese persons, ordered to be deported, that they were born in this country, was not corroborated, and their testimony in other respects was contradicted by other witnesses, their testimony as to the place of their birth need not be believed.

2. **Aliens ⬦=32(1)—Chinese previously entering can be deported under Immigration Act of 1917.**

Immigration Act Feb. 5, 1917, § 19 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj) of which authorizes deportation of an alien who entered the United States in violation of any law of the United States, and expressly provided that it should be applicable to such aliens, irrespective of the time of their entry, applies to Chinese who entered this country in violation of Chinese Exclusion Act, §§ 6, 7 (Comp. St. §§ 4308, 4320), though they entered before 1917, so that such persons can be deported after executive hearing under the Immigration Act, and are not entitled to the judicial hearing given by the Chinese Exclusion Law.

3. **Aliens ⬦=32(8)—Chinese have burden of proving right to remain.**

Under Chinese Exclusion Act May 5, 1892, § 4 (Comp. St. § 4318), requiring any person of Chinese descent to be adjudged to be unlawfully within the United States, unless he establishes his right to remain, the burden is on Chinese persons to prove their right to remain, and they can be deported if they fail to sustain such burden.

Appeal from the District Court of the United States for the Western District of New York.

Proceedings for habeas corpus and certiorari by Sit Sing Kum and another to procure their discharge from warrants of deportation. From an order dismissing the writs, petitioners appeal. Affirmed.

Dilworth M. Silver, of Buffalo, N. Y., for appellants.

Stephen T. Lockwood, U. S. Atty., of Buffalo, N. Y. (Francis E. Kerwin, Asst. U. S. Atty., of Buffalo, N. Y., of counsel), for the United States.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. This is an appeal from an order dismissing writs of habeas corpus and of certiorari remanding Sit Sing Kum and Jeu Bou to the custody of the United States immigration inspector in charge at the port of Buffalo, in the state of New York, to be deported to Canada. In some respects, this is an extraordinary and amazing case, and the facts disclose an administration of the law which ought not to happen in this country. Wherever the fault lies, the administration of the Exclusion Law should not be made ridiculous and ineffective by allowing persons who are not entitled to remain in this country to go substantially at large for a period of six years after their arrest. The facts are as follows:

The appellants are Chinese, and they were first placed under arrest on September 16, 1915, when they were leaving a ferryboat on the mainland at Buffalo, which boat had just come from Grand Island, an island in the Niagara river lying between the Canadian and United States borders. Subsequently a writ of habeas corpus was granted, and, after argument, was dismissed by the District Judge, from whose decision an appeal to this court was taken, which appeal was later withdrawn. The order dismissing the writ of habeas corpus provided that the relators should be deported to China, and this order, during the pendency of the appeal, was modified on November 7, 1917, by the District Judge, in conformity with an opinion in two other cases handed down by this court, so that the relators were ordered deported to Canada, instead of China, and, if such deportation should not be made within 15 days from the date of the order, then the relators were to be discharged from custody absolutely. The relators were discharged, and immediately thereafter rearrested on a warrant of arrest issued under the provisions of the Immigration Law of February 5, 1917, and particularly section 19 of that act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj).

A hearing was held on November 6, 1917, before the immigrant inspector in charge at Buffalo, at which appellants were represented by counsel. At hearings testimony was given tending to show that both appellants had been seen in Toronto about 2½ years before the hearing; that on September 16, 1915, they were found coming from Grand Island in a ferryboat; that they had no certificates of residence. The appellants both testified that they had no certificates of residence; that they were Chinese laborers; that each had a mother alive in China; that the father of each had died in China, but they both claimed to have been born in the United States. Sit Sing Kum testified that he had been at Grand Island, and that he had been taken over to Grand Island in a rowboat, and was on his way back when arrested. Grand Island is wholly within the United States. In the hearing in the case of Jeu Bou testimony was given tending to show that Jeu Bou at the time of his arrest was wearing articles of wearing apparel of Canadian manufacture.

A warrant of deportation under the provisions of the Immigration Act of February 5, 1917, was thereupon issued by the Assistant Secretary of Labor, dated January 8, 1918, which warrant directed the deportation of the appellants to China. Thereafter writs of habeas corpus were granted, and it is the order dismissing the writs from which this appeal was taken.

The testimony of Sit Sing Kum was that he was of the Chinese race, but was not a citizen of China, having been born in San Jose, Cal. His testimony is that his father and mother returned to China when he was 15 years old; that his father is dead and his mother is living in China. The following are excerpts from his testimony:

"Q. How do you know you were born in San Jose? A. My father and mother told me.
"Q. Is there anybody in the United States who can testify as to where you were born? A. Yes.

"Q. Who?  A. Sing Wem and Wee Sing, but I don't know the name they gave on their certificate of residence.

"Q. Are these friends or relatives?  A. Friends.

"Q. Where do they live now?  A. I don't know where they are living at the present time, because I left them since I left California.

"Q. How old were you when you left San Jose?  A.  Fifteen years old. * * *

"Q. Where did you go from San Jose?  A. San Francisco.

"Q. Who did you go with?  A. My uncle.  * * *

"Q. Where is he now?  A. He is now in California.

"Q. Do you know his address?  A. No.

"Q. How long did you live in San Francisco?  A. One year.  * * *

"Q. From San Francisco where did you go?  A. To New York.

"Q. Who went with you, if any one?  A. My same uncle.

"Q. What address did you go to in New York?  A. 17 Doyer street.

"Q. How long did you remain in New York?  A. Four years.

"Q. What did you do there?  A. Worked in a laundry, but I didn't have any regular employment.

"Q. From New York where did you go?  A. Astoria, Long Island.

"Q. What did you do in Astoria?  A. I worked on a farm there.  * * *

"Q. Are there any other Chinese farmers in that vicinity?  A. Yes.

"Q. How many?  A.  I don't know.

"Q. Do you know the names of any them?  A. I don't know.

"Q. What kind of stuff did you raise on that farm?  A. Chinese vegetables.

"Q. How large a farm was it?  A. I don't know.

"Q. How long did you live on this farm?  A. Three or four years."

Jeu Bou, like Sit Sing Kum, claimed to have been born in California, and to have been left there when his parents returned to China, when he was about 10 years old.  His father, too, died in China, and his mother was still living there.  After their return to China he came to New York.  The following is an excerpt from his testimony:

"Q. With whom did you come?  A. With some of my relatives.

"Q. What relative was it?  A. With a man of the same family as mine.

"Q. What was his name?  A. Jew Fung Chung.

"Q. Where is this man now?  A. He went back to China.

"Q. How long did you live with him? A. A few years.  * * *

"Q. Did you go to school?  A. I attended no other school except a Sunday school.

"Q. Where was the Sunday school?  A. When I went to visit Stamford City, I attended the Sunday school there.

"Q. How long did you live in New York City?  A. A few years.  I don't remember exactly.  * * *

"Q. Where did you work?  A. In a restaurant.

"Q. What restaurant?  A. I don't remember the name of the restaurant where I worked.

"Q. From New York where did you go?  A. I don't remember.

"Q. In what other cities, except San Francisco and New York, have you lived in the United States?  A.  I lived in Stamford City, and also in so many different other cities, and I don't remember their names.

"Q. Where did you live in Stamford?  A. I don't remember.

"Q. What kind of work did you do there?  A. I didn't do any work there at all.  I only went there seeking employment.

"Q. How long did you stay?  A. About one week.

"Q. Can you give us the name of any other city in the United States, except San Francisco, New York, and Stamford, where you lived?  A. I don't remember the other names."

Both men testified they had never been in China and had never been in Canada.  The evidence showed that at the time of his arrest Jeu

277 F.—13

Bou wore a hat, collar, and underwear which bore well-known Canadian labels. Asked as to this, he testified they had been given to him by a friend as a present. Asked as to the name of his friend, he answered that he did not remember his name. There was very positive testimony by two gatemen at the Union Station in Toronto, and by a police constable in Toronto, that they saw these two Chinese in the Union Station in Toronto.

[1] There was no testimony corroborating the testimony of the Chinamen that they were born in the United States. The testimony contradicting their statements that they had never been in Canada destroys all confidence in their truthfulness, and we cannot believe their story as to the place of their birth. In Lauria v. United States, 271 Fed. 261, we held that Immigration Act Feb. 5, 1917, § 19, relating to deporting of aliens, was retrospective, and authorized the deportation of aliens who entered before its passage, and who prior to entry had been convicted of crime. The Supreme Court affirmed the judgment in an opinion not yet reported. In that case the conviction took place in 1895, the alien entered in 1914, and the warrant of deportation was issued on May 5, 1920. See, also, Ex parte Gin Kato (D. C.) 270 Fed. 343.

If these men had proved their citizenship, the order for their deportation would have to be set aside. If they failed, the order of deportation must be recognized as binding, and one with which the courts cannot interfere. It was plain to the District Judge, and it is plain to us, that these men failed to prove that they were born in the United States. It also appears that they have had a hearing before the immigration inspectors, that at that hearing they were represented by counsel, that it was conducted in a fair manner, that they were granted their full legal right, that the minutes and report of the proceedings were forwarded by the immigrant inspector in charge to the Secretary of Labor, and that the Assistant Secretary of Labor has ordered their deportation, acting under section 19 of the Immigration Act of February 5, 1917. Under that act his decision is final.

[2] Immigration Act Feb. 5, 1917, § 19, is set forth in the margin in its material provisions.[1] The Secretary of Labor is given authority

---

[1] The section provides in part as follows: "That at any time within five years after entry, any alien who at the time of entry was a member of one or more of the classes excluded by law; any alien who shall have entered or who shall be found in the United States in violation of this act, or in violation of any other law of the United States * * * shall upon the warrant of the Secretary of Labor, be taken into custody and deported. * * * [Third Proviso.] Provided further, that the provisions of this section, with the exceptions hereinbefore noted, shall be applicable to the classes of aliens therein mentioned irrespective of the time of their entry into the United States. * * * [Fifth Proviso.] Provided further that any person who shall be arrested under the provisions of this section, on the ground that he has entered or been found in the United States in violation of any other law thereof which imposes on such person the burden of proving his right to enter or remain, and who shall fail to establish the existence of the right claimed, shall be deported to the place specified in such other law. In every case where any person is ordered deported from the United States under the provisions of this act, or of any law or treaty, the decision of the Secretary of Labor shall be final."

to arrest and deport on departmental warrant alien Chinese persons found within the United States in violation of the act, or in violation of any other law of the United States. It is to be observed, too, that the section 19 is by express provision made applicable to the classes of aliens therein mentioned irrespective of the time of their entry into the United States.

The warrant of arrest recited that the aliens, naming them—

"landed near the port of Buffalo, N. Y., on or about the 15th day of September, 1915, are subject to be taken into custody and returned to the country whence they came under section 19 of the Immigration Act of February 5, 1917, being subject to deportation under the provisions of a law of the United States, to wit, the Chinese Exclusion Law, for the following among other reasons: That they have been found within the United States in violation of section 6, Chinese Exclusion Act of May 5, 1892, as amended by the Act of November 3, 1893 [Comp. St. § 4320], being Chinese laborers not in possession of certificates of residence, and that they entered the United States in violation of section 7, Chinese Exclusion Act of September 13, 1888 [Comp. St. § 4308], and rule 1, Chinese Rules."

The counsel for the appellants claims that they are entitled to have their hearing under the provisions of the Immigration Act of February 20, 1907 (34 Stat. 898), and not under that of 1917, above referred to, as he claims that they were here prior to the passage of the act of 1917, the further claim being advanced that under the act of 1907, the Secretary of Labor has not jurisdiction to deport Chinese to China, but that upon arrest they were entitled to a hearing under the Chinese Exclusion Law, which provides for a judicial deportation proceeding, and he cites in support of his claim United States v. Woo Jan, 245 U. S. 552, 38 Sup. Ct. 207, 62 L. Ed. 466. That case would support the argument if the act of 1907 and not that of 1917 is applicable to the appellants; but as we have already pointed out the act of 1917 is expressly made applicable, irrespective of the time these men entered the United States. It is idle, therefore, to argue that it does not and cannot have a retroactive application. The courts have in a number of cases held that the act of 1917 applied exclusively to Chinese persons found in the United States in violation of the Chinese Exclusion Acts. Mayo, Immigration Commissioner, v. United States ex rel. Lee Wong Hin, 251 Fed. 275, 163 C. C. A. 431; Ng Leong v. White, 260 Fed. 749, 171 C. C. A. 487; Ng Fung Ho v. White (C. C. A.) 266 Fed. 765. And this court as already pointed out has decided the question in the Lauria Case.

[3] Under Act May 5, 1892, c. 60, § 4, 27 Stat. 25 (Comp. St. § 4318), any Chinese person or person of Chinese descent, arrested as being unlawfully in the country, "shall be adjudged to be unlawfully within the United States," unless he establishes by affirmative proof to the satisfaction of the judge or commissioner his right to remain. The burden of proof was on these appellants, and they have not sustained it.

The order dismissing the writ of habeas corpus is affirmed, and the appeals are dismissed.